# EXHIBIT A

1.0

## COMMONWEALTH OF MASSACHUSETTS
### SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT

NORFOLK, ss.

| | |
|---|---|
| ARTHUR STEIN, | |
| Plaintiff, | **DOCKET NO.:** 21cv 1000 |
| v. | |
| WESTINGHOUSE ELECTRIC COMPANY LLC, and CHRISTOPHER WARE | |
| Defendants. | |

### COMPLAINT AND JURY DEMAND

#### Parties

1.      Plaintiff Arthur Stein ("Stein") is an individual who resides at 131 Brook Road Sharon, Massachusetts 02067.

2.      Defendant Westinghouse Electric Company, LLC ("Westinghouse" or "the Company"), is a limited liability company with a principal place of business located at 1000 Westinghouse Drive Cranberry Township, Pennsylvania 16066 and Massachusetts branch that was located at 720 University Avenue Norwood, Massachusetts 02062.[1]

3.      Defendant Christopher Ware ("Ware") is an individual who resides at 238 Village Drive Canonsburg, Pennsylvania 15317.

---

[1] Plaintiff worked at this Norwood address when he was employed at Westinghouse, which is during the relevant period for this case. Currently, all Norwood-based employees work remotely.

1

## Jurisdiction and Venue

4.       Jurisdiction of this Court is lawful and proper as Defendant, conducts business in Massachusetts and Defendant's unlawful acts occurred in Massachusetts.

5.       Venue in Norfolk County is lawful and proper as Plaintiff resides there and, during the relevant time period, Westinghouse conducted business in Norwood, Massachusetts, where Plaintiff worked.

## Exhaustion of Administrative Remedies

6.       Mr. Stein properly exhausted his administrative remedies pursuant to G.L. c. 151B.

7.       On or about November 2019, Mr. Stein, through counsel, filed a charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD") alleging the same violations of G.L. c. 151B that are the subject of this Complaint.

## Facts Common to All Counts

8.       Stein was 77 years old at the time of his termination in 2019.

9.       In 2016, Westinghouse acquired CB&I Stone & Webster, Inc., where Mr. Stein worked as an engineer for 36 years.

10.      Mr. Stein remained with the company during the acquisition and beyond.

11.      Mr. Stein was a loyal and productive engineer for Westinghouse (and its predecessor) for nearly four decades, and he enjoyed an excellent reputation in the industry.

12.      Mr. Stein's performance reviews had regularly been excellent throughout his tenure, and he had consistently been the "go-to" person to resolve issues regarding material's engineering.

13.     After Westinghouse took control of the Company, it began a campaign of terminating or forcing out, older employees and replacing them with younger employees, many of whom were lesser qualified.

14.     This effort manifested itself in many forms, including terminating numerous older employees at its Norwood, Massachusetts location (which was comprised of mostly employees over the age of 50).

15.     The responsibilities of these older employees were transferred to younger, less-experienced employees at the Company's locations in Cranberry Township, Pennsylvania and Waynesboro, Georgia.

16.     The Company also singled out the Norwood office with the imposition of harsh policies not applicable elsewhere in the Company, such as, (1) employees at the Norwood location would no longer be eligible for raises above a certain amount and (2) employees at the Norwood location were not able to receive the Westinghouse benefit policy where severance packages would include one week of pay for each year of service.[2]

17.     These actions alone evidence a clear effort to encourage these employees to leave and/or retire.

18.     Mr. Stein began to notice that he too was being subjected to an age-biased effort to force him out of the Company.

19.     In January 2018, Mr. Stein was asked by his then-supervisor, Iain Dimond, whether he would agree to reduce his hours so that a much younger employee who had just completed college on an educational leave, Ryan Railton, would have sufficient work.

---

[2] Upon information and belief, the majority of the Norwood location employees had more than 25 years of service with the Company.

20.    Mr. Stein did not wish to reduce his hours, enlisted the assistance of human resources, and the issue was dropped.

21.    In July 2019, Mr. Stein was assigned to report to a new manager, Chris Ware, who is believed to be in his late 30's or early 40's.

22.    At Mr. Stein's introductory meeting with Mr. Ware, Mr. Stein made a reference to being one of the more senior employees at the Company and, oddly, Mr. Ware responded that in preparation for his meeting with Mr. Stein, "human resources specifically instructed me to not bring up your age," or words to that effect.

23.    Just a few months later in September 2019, Mr. Stein was again asked to reduce his hours, this time by Mr. Ware.

24.    Later that month, Mr. Ware sent Mr. Stein a list of job openings that were available for him to review.

25.    Each of these job openings were not within Mr. Stein's experience or expertise and required a temporary relocation to a job site in Georgia.

26.    Mr. Stein has lived in Massachusetts for 38 years and did not wish to relocate to Georgia in his late 70s.

27.    Mr. Stein was interested in working on nuclear projects that were more in his area of expertise; thus, Mr. Stein requested to work on opportunities with the EVinci project.

28.    Mr. Stein was told that he could not be assigned to the EVinci project as all positions were filled.

29.    Mr. Stein then applied for a Principal Nuclear Engineer position at the Westinghouse, Pennsylvania location.

4

30. The Principal Nuclear Engineer position did not require a Ph.D. in Nuclear Engineering, but at least some experience within the field, which Mr. Stein had.

31. The Company denied Mr. Stein an opportunity to be interviewed for the position and instead hired an individual who was new to Westinghouse and was much younger in age.

32. After Mr. Stein again declined to decrease his work schedule and the Company refused to provide Mr. Stein with another position within Westinghouse, the Company terminated him on October 23, 2019.

33. Mr. Stein was unaware that if he rejected the idea of reducing his work schedule that he would be immediately terminated. The Company certainly could have made him aware of this.

34. Moreover, the rationale for his termination was that there was an alleged "lack of work."

35. This reason is false as Mr. Stein had been consistently billing clients approximately forty hours a week for his time and was on several proposals for new work.[3]

36. To the extent that those billable hours had been reduced, the Company had been assigning more such work to less-experienced, less-qualified, and much younger employees.

37. Further, the "Change in Status Notification" provided Mr. Stein within his "WECTEC Separation Package" states that the reason for his termination was a "Reduction in Force," which is also untrue.

---

[3] Westinghouse changed their Company policy to classify employee work as "billable" or "non-billable." In September 2019, Plaintiff had around four (4) to eight (8) hours of non-billable work per week. This number increased to eight (8) to sixteen (16) hours a week in October 2019. This was due to Westinghouse assigning billable to other employees rather than Mr. Stein. Moreover, Mr. Stein still had significant billable hours at the time of his termination.

38.     To add insult to injury, the Company offered Mr. Stein no real severance for his 36 years of dedicated service; instead, just providing two weeks of notice pay.

39.     When Mr. Stein inquired as to why there was no severance, he learned that the Company has a severance policy; however, the Norwood location was excluded from that policy.

40.     This is yet another blow to the older employees at the Norwood location who have faithfully served the Company (and its predecessor company) for years.

41.     Between 2018 and 2019, the Company has laid off many employees from the Norwood office.

42.     Of the employees laid off from the Norwood office, 85% of them were age 50 or older.

43.     This is consistent with Mr. Stein's position that the Defendants targeted and drove out older employees who were located at the Norwood office.

44.     This number is also a stark contrast to the 12 employees who were laid off from the Cranberry Township office, which has a much greater number of employees in total.  The terminated employees at that location had an average age of 36 years old.

45.     Westinghouse also placed a salary cap policy on the Norwood employees only.

46.     The Company may allege that salary increased are based on individual performance in comparison with corresponding market pay and the manager's budget.

47.     Yet Mr. Stein's then-supervisor Roy Terry sent an email to the Norwood employees on January 15, 2019, which stated: "Please note that all Norwood based employees that have a current salary above 143K were not eligible for a pay raise during this process.  This

is not a reflection of your efforts or whether you merit an increase, but this was a corporate limitation imposed on this process.  Thank you for understanding."

48.     Mr. Terry's email contradicts the Company's salary increase policy and further supports the discriminatory treatment to Mr. Stein and the rest of Westinghouse's Norwood-based employees.

49.     Mr. Stein is more than willing and capable to continue in the workforce, but has been unable to find any comparable employment to his Westinghouse career and is unlikely to do so at his age.

## Count I

### VIOLATION OF G.L. c. 151B, § 4 (1)
### v. Westinghouse Electric Company, LLC

50.     Plaintiff repeats the allegations set forth above and below as if fully contained herein.

51.     Mr. Stein, as an individual over seventy (70) years old, is a member of a protected class.

52.     Mr. Stein, at all times relevant hereto, performed his job for Westinghouse at an acceptable level.

53.     Westinghouse terminated Mr. Stein due to his age.

54.     As a result of Westinghouse's unlawful conduct, Mr. Stein has sustained damages including but not limited to lost wages, lost benefits, emotional distress, attorneys' fees, costs, and interest.

## Count II

### VIOLATION OF G.L. c.151B, § 4 (4A)
### v. Chris Ware

55.     Plaintiff repeats the allegations set forth above and below as if fully contained herein.

56.     Mr. Ware coerced, intimidated, threatened, and interfered with Mr. Stein's exercise and enjoyment of his rights granted and protected by Massachusetts General Laws, chapter 151B.

57.     Mr. Ware violated Mr. Stein's right to be free from discrimination in the terms, conditions, and privileges of employment.

58.     Mr. Ware's unlawful conduct was based on their intent to discriminate against Mr. Stein.

59.     Mr. Ware was involved in Westinghouse's decision to terminate Mr. Stein's employment and caused Mr. Stein to be terminated.

60.     As a result of Mr. Ware's unlawful conduct, Plaintiff has sustained damages including but not limited to lost wages, lost benefits, emotional distress, attorneys' fees, costs, and interest.

## Count III

### VIOLATION OF G.L. c.151B, § 4 (5)
### v. Chris Ware

61.     Plaintiff repeats the allegations set forth above and below as if fully contained herein.

8

62.     Mr. Ware aided, abetted, compelled, and coerced Westinghouse to violate the prohibitions of chapter 151B of Massachusetts General Laws.

63.     Mr. Ware actively and intentionally provided substantial and supportive assistance to Westinghouse's intentional discriminatory conduct in violation of chapter 151B of Massachusetts General Laws.

64.     Westinghouse terminated Mr. Stein's employment with the intentional and knowing assistance of Mr. Ware.

65.     As a result of Mr. Ware's unlawful conduct, Plaintiff has sustained damages including but not limited to lost wages, lost benefits, emotional distress, attorneys' fees, costs, and interest.

## Prayers for Relief

WHEREFORE, Plaintiff Arthur Stein respectfully requests that the Court grant him the following relief:

A.     Enter judgment in his favor and against the Defendants on all counts of the Complaint;

B.     Award damages to Plaintiff in an amount determined by the Court;

C.     Treble such amount as provided for in M.G.L. c. 151B § 9, and award interest, costs, attorneys' fees, and punitive damages to Plaintiff;

D.     Grant such other and further relief, as the Court deems proper.

## Jury Demand

PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.

9

Respectfully submitted,

ARTHUR STEIN,

By his attorney,

Matthew J. Fogelman (BBO# 653916)
FOGELMAN LAW LLC
189 Wells Avenue
Newton, MA 02459
617-559-0201
mjf@fogelmanlawfirm.com

Dated: October 29, 2021